UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JESSICA MARY COLLINS, | : | |
| | : | CIVIL ACTION NO. 3:15-CV-1069 |
| Plaintiff, | : | |
| | : | (JUDGE CONABOY) |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

_____

**MEMORANDUM**

Here the Court considers Plaintiff's appeal from the Commissioner's denial of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Doc. 1.) Plaintiff applied for benefits on November 6, 2012, alleging disability beginning on June 1, 2012. (R. 11.) The onset date was later amended to the application date. (R. 36.) A November 28, 2012, Disability Report indicates that Plaintiff claimed her ability to work was limited by rheumatoid arthritis and bone spurs in both knees, borderline personality disorder, OCD, Bipolar 2, loss of range of motion in both knees, and the need for knee replacements. (R. 213.)

Plaintiff's claim was initially denied on March 14, 2013. (R. 11.) On March 27, 2013, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 94-96.) A hearing was held on March 27, 2013, but, due to recording difficulties, another hearing was held on December 23, 2014, before ALJ Sharon Zanotto.

(R. 11.)  Plaintiff appeared in person at the hearing along with her attorney, Thomas Meister.  (*Id.*)  Brian Bierley, a Vocational Expert ("VE") also testified.  (*Id.*)

In her January 8, 2015, Decision, ALJ Zanotto concluded Plaintiff had the severe impairments of osteoarthritis of the knees, right lower extremity complex regional pain syndrome, bipolar disorder, and personality disorder.  (R. 13.)  ALJ Zanotto determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the listings.  (*Id.*)  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 20.)  The ALJ therefore found Plaintiff had not been disabled under the Act since November 6, 2012.  (R. 21.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred as a matter of law in failing to provide any legitimate reasons for rejecting the opinion of a consulting psychologist; 2) substantial evidence does not support the ALJ's RFC assessment; 3) substantial evidence does not support the ALJ's credibility evaluation.  (Doc. 12 at 1-2.)  After careful consideration of the administrative record and the parties' filings, I conclude Plaintiff's appeal is properly denied.

2

## I. Background

### A.   *Procedural Background*

Plaintiff filed this action on May 30, 2015.  (Doc. 1.)  She appeals the denial of benefits made final by the April 2, 2015, Appeals Council denial of her request for review of the ALJ's decision (R. 1).

Defendant filed her answer and the Social Security Administration transcript on July 31, 2015.  (Docs. 9-10.) Plaintiff filed her supporting brief on September 13, 2015. (Doc. 12.)  Defendant filed her opposition brief on October 23, 2015. (Doc. 16.)  Plaintiff filed her reply brief on October 30, 2015. (Doc. 17.)  Therefore, this matter is fully briefed and ripe for disposition.

### B.   *Factual Background*

Plaintiff was born on July 22, 1984.  (R. 20.)  She was twenty-eight years old on the date she filed her SSI application. (*Id.*)  She has at least a high school education.  (*Id.*)

### 1.   Impairment Evidence

#### a.   *Physical Impairments*

The ALJ determined that Plaintiff had the severe physical impairments of osteoarthritis of the knees and right lower extremity complex pain regional syndrome.  (R. 13.)  Therefore, our review of evidence focuses on these impairments.

On August 27, 2012, Jon M. Keller, D.O., of Welsh Mountain saw

Plaintiff as a new patient and recorded her chief complaint to be diabetes.  (R. 309.)  He noted that her additional complaints included right knee pain, that her knee had dislocated several times in the preceding few months, and she had knee surgery in 2008.  (*Id.*)  Plaintiff had similar complaints about her left knee but had not had surgery.  (*Id.*)  She also had arthritis in both knees and pain in the thoracic area of the back which occurred for two to three days at a time.   (*Id.*)  Dr. Keller prescribed a knee brace.  (R. 313.)

On October 17, 2012, Plaintiff saw Gregory E. Raab, M.D., of the Penn State Milton S. Hershey Medical Center for the chief complaint of bilateral knee pain and to discuss possible surgical intervention.  (R. 304.)  Plaintiff reported the following: she had knee problems for years; her previous surgery, braces and physical therapy had not helped; Tramadol and prednisone had not helped; and she took Tylenol Arthritis as needed.  (*Id.*)  Dr. Raab found mild swelling of the right knee, range of motion 5-115 degrees with crepitus, and tenderness over the patella and medial joint line. (R. 305.)  Regarding the left knee, Dr. Raab found mild tenderness anteriorly and the knee was stable throughout the range of motion. (*Id.*)  Updated x-rays showed bilateral patella alta, the right knee showed patellofemoral narrowing with osteophyte formation laterally as well as some medial joint space narrowing. (*Id.*)  Dr. Raab recommended total knee arthroplasty, but he told Plaintiff he would

4

not proceed until she quit smoking.  (*Id.*)  Plaintiff said she planned to do so.  (*Id.*)   She was instructed to call his office when she stopped smoking and appropriate pre-surgical lab work would be done at that time.  (*Id.*)

On October 23, 2012, Plaintiff again saw Dr. Keller.  (R. 313.)  Plaintiff talked with Dr. Keller about the need to quit smoking before knee surgery and wanted to discuss taking Chantix to help her quit.  (*Id.*)  She also reported that Tylenol #3 was helping slightly with pain, the knee sleeve was not effective, and she wanted to discuss a knee brace or stabilizer.  (*Id.*)

Plaintiff went to the emergency room at Good Samaritan Hospital on November 14, 2012, complaining of severe knee pain. (R. 326.)  She reported that she had been told she needed bilateral knee replacements but she was going for a second opinion.  (*Id.*) She also reported that she had no pain medication because her primary care physician was no longer treating her for her knees since she had seen an orthopedic surgeon.  (*Id.*)  Physical examination showed her right knee was very tender to palpation with significant effusion, her left knee was mildly tender to palpation with effusion, she had full range of motion of both knees, and she was neurovascularly intact throughout.  (R. 327.)   Plaintiff was diagnosed with knee pain-osteoarthritis, directed to follow up as scheduled with her orthopedic surgeon, use Percocet as needed for pain, use Lidacain patch for pain, continue to pursue an

appointment with pain management and return if any concerns.  (R. 325.)

Plaintiff again presented to the Good Samaritan emergency department on November 17, 2012, for complaints of bilateral knee pain.  (R. 322.)  Plaintiff had full range of motion bilaterally, moderate effusion of her right knee, and mild, diffuse tenderness to palpation.  (R. 323.)  She was diagnosed with chronic bilateral knee pain.  (*Id.*)

On November 20, 2012, Plaintiff saw William Parrish, M.D., for a second opinion regarding her chronic knee pain and effusions, and Dr. Raab's knee replacement recommendation.  (R. 430.)  Dr. Parrish recorded the following physical examination findings:

> Her knee has full range of motion, although there is a moderate amount of patellofemoral crepitus.  She also has a mild effusion.  She ambulates without any assistive device but does have a slightly antalgic gait.  Her knee is hypersensitive to touch, and she complains of a burning pain along the medial aspect of her leg and also pain along the lateral aspect of the leg coming down along the IT band at the knee into the tibial tubercle. Even mild displacement of the patella causes exceptional pain.  My first impression was that her pain was out of proportion with her disease.

(R. 430.)  Dr. Parrish reviewed x-rays from Penn State and noted that they showed what he would consider very mild to moderate joint space narrowing in the medial compartment.  (*Id.*)  He noted that she "had a little osteophyte along the lateral patella but

6

otherwise no significant secondary arthritis findings and no
significant or dramatic subacromial sclerosis, osteophytes,
subchondral systs, etcetera." (*Id.*)  Dr. Parrish reported that he
explained his findings and concerns:

> I explained that I have a concern that while
> she has pain it may not be secondary to her
> arthritis, and I thought a diagnostic
> injection with Xylocaine and Kenalog in an
> attempt to try to sort this out would be
> helpful from both a diagnostic and treatment
> standpoint.  We spent an extended period of
> time with her, and after explaining the
> reason to her she went ahead and wanted to
> proceed with an aspiration and injection. . .
> . Linda attempted to aspirate this, and the
> patient went literally ballistic and had pain
> that was off the chart out of proportion for
> the procedure being done.  We were unable to
> complete that attempted aspiration and
> injection at all, as the patient did
> hyperventilate and was unable to proceed.
>
> I explained to her at that point that I
> thought her pain was well out of proportion
> for the procedure we just tried and that it
> would be in her best interest to perhaps be
> evaluated by pain management.  I told her I
> think she really needs to get a pain
> management appointment and see what they
> think.  At this point, I do not know what
> else I have to offer her, but I would tell
> her very strongly that I do not think she
> should proceed with a total knee replacement
> as I think her outcome would be very poor.

(*Id.*)

Plaintiff had a pain management consultation on November 28,
2012, with Robert Guirguis, M.D., on Dr. Keller's referral.  (R.
355.)  Her chief complaint was bilateral knee pain, right greater
than left. (*Id.*)  Plaintiff received right L3 sympathetic ganglion

7

blocks on November 28, 2012, December 10, 2012, and December 17, 2012.  (R. 493, 490, 489.)

     Plaintiff saw Dr. Guirguis on January 2, 2013, for follow up. (R. 346.)  Plaintiff reported that she got an itchy rash from her last injection, her knee pain was worse, and her medications gave her constipation.  (*Id.*)  She also reported that she had increased right hip pain after the injection and was instructed to increase Percocet--she was taking up to ten to twelve per day.  (R. 347.) Plaintiff described the pain as burning, bilateral knee pain with radiation into the calf and upper thigh, and she noted swelling, color (purple) changes, and sensitivity to touch on the anterior portion of her right knee.  (*Id.*)  Plaintiff said she was taking hydrocodone with benefit and no side effects.  (*Id.*)  Dr. Guirguis reported Plaintiff's overall improvement to be significant (greater than 50%).  (*Id.*)  Dr. Guirguis commented in general that Plaintiff answered questions appropriately, showed no overt pain behaviors, no signs of impairment from medications, her speech and affect were normal, and she had no suicidal thoughts or clinical depression. (*Id.*)  He noted Plaintiff had some swelling of the right knee and spinal tenderness to digital palpation.  (R. 347, 348.)  He diagnosed bilateral knee osteoarthritis, right greater than left knee pain, and right lower extremity Complex Regional Pain Syndrome.  (R. 348.)  Dr. Gurguis decreased Percocet to no more than four per day and wanted to see Plaintiff in one month.  (R.

349.)

Plaintiff received light L3 ganglion blocks on May 13, 2013, June 20, 2013, and July 22, 2013.  (R. 464, 463, 497.)

On September 5, 2013, Plaintiff was seen for hip pain by Daniel M. Lorenzo, M.D., of the Lebanon Pain Relief Center.  (R. 441.)  She reported onset was one week before her visit, pain level was severe with duration variable, and the pain radiated to the right thigh and lower leg and foot.  (*Id.*)  She described the pain as an ache and a burning with no relieving factors.  (*Id.*)  Dr. Lorenzo assessed chronic pain syndrome, pain in joint involving lower leg, reflex sympathetic dystrophy of the lower limb, lumbago, and myalgia and myositis.  (R. 442.)  He planned to schedule Plaintiff for lumbar thoracic sympathetic blocks.  (*Id.*)  She received right L3 lumbar sympathetic ganglion blocks on September 16, 2013, September 23, 2013, and September 30, 2013.  (R. 451-53.)

Plaintiff saw Dr. Lorenzo again on November 21, 2013, for worsening right knee pain.  (R. 613.)  She reported a severity level of six, she was taking five oxycodone per day, and the blocks had been helpful.  (*Id.*)  Plaintiff also reported that the knee pain increased after a recent "fender bender" and she had taken a friend's Vicodin when she did not have her medications.  (*Id.*)  Plaintiff's gait was antalgic, she had moderate pain with motion, and right knee allodynia.  (R. 616.)  Dr. Lorenzo's diagnosis was unchanged, and he refilled Plaintiff's medications and instructed

9

her to take only the medications prescribed.  (R. 617.)

On December 29, 2013, Plaintiff rated her knee pain at seven and constant.  (R. 612.)  Examination, diagnosis and plans were similar to those of previous visits.  (R. 613-14.)

On January 16, 2014, Plaintiff presented to Dr. Lorenzo with severe leg pain which was occurring constantly and was worsening. (R. 608.)  She reported that the pain was aggravated by movement, walking, standing and driving, and it was relieved by heat and prescription pain medications.  (*Id.*)  She also reported associated symptoms including decreased mobility and difficulty initiating sleep.  (*Id.*)  Plaintiff stated that the right knee burning sensation was increasing.  (*Id.*)  She complained of some deep aching in her left knee.  (*Id.*)  Dr. Lorenzo recorded that Plaintiff's gait was antalgic and her lumbar spine range of motion was mildly reduced.  (R. 609.)  Dr. Lorenzo planned to schedule Plaintiff for additional lumbar/thoracic sympathetic blocks.  (*Id.*)

On March 12, 2014, Plaintiff presented to Dr. Lorenzo with leg pain which she rated as seven in severity.  (R. 606.)   She reported worsening pain in her right foot radiating to her right calf, and noted that it was aggravated by sitting, walking, and standing.  (*Id.*)  Dr. Lorenzo recorded that Plaintiff was hoping for an increase in medication.  (*Id.*)

On June 3, 2014, Plaintiff presented to Dr. Lorenzo with low back pain which was moderate to severe and right knee pain.  (R.

10

602.)  Plaintiff reported that her symptoms were aggravated by

daily activities and she denied any relieving factors.  (*Id.*)

Plaintiff also reported that she had weaned herself off medications

since her March visit, she was in terrible pain, the burning pain

in her right knee had returned, and she had some recent depression

and many life stressors.  (*Id.*)   Dr. Lorenzo noted that Plaintiff

was oriented to time, place, person and situation, her mood and

affect were appropriate, and she had normal insight and judgment.

(R. 604.)  He planned to restart her meds and to do more blocks

when able.  (*Id.*)

On September 5, 2014, Plaintiff presented to Dr. Lorenzo with

mild to moderate leg pain which she said was constant and

worsening. (R. 632.)  She reported the pain was aggravated by

bending, climbing and descending stairs, and standing, and it was

relieved by heat and rest.  (*Id.*)  Plaintiff was taking Percocet

10mg-bid which she had been getting from her mother.  (*Id.*)  Her

goal was to wean herself off everything prior to right knee

surgery.  (*Id.*)  Physical examination showed Plaintiff had a normal

gait and she had moderate pain with motion of her right knee.  (R.

634.)  Dr. Lorenzo noted that Plaintiff was oriented to time,

place, person and situation, her mood and affect were appropriate,

and she had normal insight and judgment.  (*Id.*)  Dr. Lorenzo's

diagnoses remained the same.  (*Id.*)  He planned to schedule the

lumbar/thoracic blocks, gave Plaintiff weaning instructions, and

11

discussed that taking medications from other people was both dangerous and illegal. (*Id.*)

On September 25, 2014, Plaintiff again presented to Lebanon Pail Relief Center for leg pain ans was seen by Kristi L. Yacklovich-Menicheschi. (R. 628)   She reported the pain to be moderate to severe, constant, and worsening. (*Id.*)  It was aggravated by rain and relieved by prescription pain medications. (*Id.*)  She was seen a week before her scheduled appointment due to muscle strain of the lumbar spine. (*Id.*)  Plaintiff stated that she hoped to be put back on morphine as she had been taking too many Percocet and had only eight left. (*Id.*)  The results of her urine screen were positive for cocaine. (*Id.*) She was told no medications would be prescribed and she was advised to take one Percocet daily for the next eight days to minimize withdrawal. (*Id.*)  She was also told she would have to get another pain doctor--she could be seen at Lebanon Pain Relief Center for injections but meds would not be prescribed. (*Id.*)  Plaintiff wanted to talk to Dr. Lorenzo and she was advised that she should keep her regularly scheduled follow up appointment. (*Id.*)  It was noted that Plaintiff was oriented to time, place, person and situation, and her mood and affect were appropriate. (R. 630.)

On November 4, 2014, Plaintiff was seen at the Good Samaritan Hospital Emergency Department. (R. 647.)  She complained of intermittent pain and numbness in her left leg for the preceding

three weeks which had become constant for the last day.  (*Id.*)  Her family doctor, Dr. Keller, had instructed her to go the ER to rule out a blood clot.  (*Id.*)  The pain was primarily located in the upper thigh radiating down her leg and was associated with paresthesias but Plaintiff had no back pain, trauma, bowel or bladder dysfunction, or difficulty ambulating.  (*Id.*)  Other than the symptoms associated with the presenting problem, Plaintiff reported that she had no other problems, including no other aches or pains, no generalized or localized weakness, and no emotional distress.  (*Id.*)  Plaintiff reported her medications at the time to be Depakote and Lithium.  (*Id.*)  Physical examination showed that Plaintiff was in mild distress.  (*Id.*)   Examination of her extremities was negative for tenderness and swelling.  (*Id.*)  Plaintiff was diagnosed with a urinary tract infection and leg pain.  (R. 649.)

On December 5, 2014, Plaintiff saw Ronald Vandergriff, D.O., at the Lebanon Ridge Community Health location of Ephrata Community Hospital.  (R. 660.)  Plaintiff's chief complaint was right foot/leg numbness, and she also complained of severe low back pain and numbness going down her leg.  (*Id.*)  She wanted a referral for pain management.  (*Id.*)  Dr. Vandergriff recorded the following "History of Present Illness":

> Pt states "she" stopped going to Dr[.] Lorenzo after her last injection, started having intermittent pain into left leg with some numbness also. She stated initially to

> Tina2, that she  needed a new referral to Dr.
> Lorenzo, but when physician spoke to pt, she
> changed her request to be referred to a
> different pain management office.  Pt then
> started getting mad that WE got the story
> wrong and that she has been waiting over a
> [sic] hour in WR.  I corrected her on this
> and informed her that I instructed Tina2 to
> go and get her earlier than her scheduled
> appt. and she did.  So, she was seen before
> her scheduled time and the physician came in
> 5 minutes after Tina2 came out of the room.
> Pt started getting louder, I explained to her
> in plain laymen terms, that I am trying to
> help her and that this is her first visit
> with me and that she hasn't been to LRCH for
> over 20 months.  She stated how she needs to
> get her oxycodone refilled.  I explained
> calmly in laymen terms that we have no
> records of her being on oxycodone and that we
> don't do chronic pain management.  She stated
> that she was going to go through withdraw
> [sic].  I asked her who was refilling her
> oxycodone since she wasn't seeing Dr[.]
> Lorenzo since her last injection Sept 2013?

(R. 662.)  Examination revealed that Plaintiff was moving all extremities without difficulty.  (R. 663.)  Dr. Vandergiff noted regarding Plaintiff's left lower extremity that "pain, when present, shoots down post aspect of buttocks/leg."  (*Id.*)  He found her gait was normal.  (*Id.*)  His "Assessment/Plan" included right knee pain, lumbar back pain, sciatica, a prescription for Prednisone and referral to pain management.  (R. 660.)

On December 16, 2014, Plaintiff was seen at the Good Samaritan Hospital Emergency Department for lower back pain.  (R. 669.)  She reported that it had gotten worse over the previous few days and she had been doing a lot of laundry and carrying baskets over the

14

preceding few days.  (*Id.*)  Other than the symptoms associated with the presenting problem, Plaintiff reported that she had no other problems, including no other aches or pains, no generalized or prior localized weakness, and no emotional distress.  (*Id.*) Physical examination showed that Plaintiff was in mild painful distress and examination of her back showed diffuse tenderness in the paralumbar area and mild spasm.  (*Id.*)  After evaluation, the clinical impression was acute exacerbation of chronic lower back pain.  (R. 670.)

b.   *Mental Impairments*

The ALJ determined that Plaintiff had the severe mental impairments of Bipolar Disorder and Personality Disorder.  (R. 13.)

An April 2, 2013, Discharge Note from Philhaven indicates that Plaintiff's last visit was on October 8, 2012, and her diagnosis included Bipolar Disorder Mixed.  (R. 533.)  Her GAF at admission was 30 and at discharge it was 40.  (*Id.*)  The Short Summary of Treatment indicates that Plaintiff had been missing appointments despite being in the midst of medication changes.  (*Id.*)  The signature is not legible but the name "Walters" appears at the bottom of the one-page note.  (*Id.*)

A Philhaven Outpatient Interdisciplinary Evaluation was conducted on May 17, 2013, by Susan Spater Zimmerman, M.D.  (R. 576-79.)  Dr. Zimmerman recorded that Plaintiff had a long history of Bipolar Disorder and she had both depressed and manic states.

15

(R. 576.)

> In the past, it has been cycling internally.
> It appears to have slowed down.  Today, she
> presents in a depressed state.  She says that
> she had been taking her medications and was
> vague about discontinuing the medications,
> thereby trying to return to Dr. Walters.  She
> stated that instead of 3 months for which she
> made an appointment, but the insurance
> company has changed its rules and it needs to
> be every two months otherwise she is
> considered not to be in care.  The patient
> states that she has been having mood problems
> since age 14 and has had several inpatient
> evaluations plus an inpatient stay at
> Philhaven 2 years ago.  She also has a
> history of significant trauma, being
> emotionally, verbally, physically, and
> sexually abused at different points in her
> life and has received SARC services.  The
> patient also reports that she has had a long
> history of anxiety problems, including
> Obsessive Compulsive Disorder, requiring
> herself to be extremely perfectionistic and
> neat and needing to have everything straight.
> She has a history of panic attacks for which
> she has been given Ativan up to b.i.d. prn
> and also a history of polysubstance abuse for
> which she has rejected inpatient rehab except
> one time in 2007 for 28 days in Long Island,
> N.Y.  The patient also volunteers that she
> lies chronically and describes the [lies]
> that she says and they are apparently to
> either avoid reactions from people or to
> manipulate.  She has had feelings that people
> are watching her in the past and severe
> irritability and explosive temper.

(*Id.*)  On Mental Status Examination, Dr. Zimmerman noted that

Plaintiff was extremely anxious, tense, and mildly agitated, she

was coherent and lucid, her mood was depressed and her affect

mildly irritable and agitated, but she was mostly appropriate,

could have a reasonable conversation and was aware that she has

16

mental illness problems.  (R. 577.)  Dr. Zimmerman found that
Plaintiff had no loosening of associations, no psychotic processes,
and she denied auditory or visual hallucinations, and her judgment,
insight and impulse control were fair.  (*Id.*)  Plaintiff wanted to
go back on medication, return to Dr. Walters' outpatient medical
management service and be part of a counseling group.  (*Id.*)  Dr.
Zimmerman provided the following Assessment/Formulation:

> The patient is a 28-year-old Caucasian
> female who is diagnosed with Bipolar when she
> was 14-years-old.  She has a very strong
> genetic predisposition to Bipolar Disorder
> and addiction problems of which she has also
> had.  She has had several times when she
> discontinued her medication.  On this
> occasion, it sounds like she discontinued her
> medication and then decided to return to it
> and then found out that she was unable to
> return to the doctor to get refills.  The
> patient is also a chronic pain patient
> secondary from Juvenile Rheumatoid Arthritis
> and has a preponderance of severe anxiety
> symptoms.  She has a history of a diagnosis
> of Obsessive Compulsive Disorder and more
> recently panic attacks.

(R. 578.)  Dr. Zimmerman diagnosed Plaintiff with Bipolar Disorder,
most recent episode, depressed, and by history Polysubstance
Dependency, Obsessive Compulsive Disorder, and Panic Attacks,
without Agoraphopia.  (*Id.*)  She also noted "Rule Out: Borderline
Personality Disorder."  (*Id.*)  Plaintiff's GAF was assessed to be
38, and the highest GAF in the past year was 45.  (*Id.*)  Plaintiff
was prescribed Lithium, Ativan, and Prozac.  (*Id.*)  She was to
return to her previous provider and request a counseling group.

(*Id.*)  Plaintiff was counseled on medication compliance and advised not to stop and start medications as she had in the past.  (R. 579.)

A Philhaven Outpatient Services Clinical Assessment dated June 4, 2013, contains basically the same information as that provided to Dr. Zimmerman in May.  (R. 585-86.)

Plaintiff saw Cynthia Fonder, M.D., at Philhaven on June 19, 2013.  (R. 568.)  In the Mental Status Exam, Dr. Fonder noted under "Behavior" that Plaintiff's eyes moved around secondary to taking opioids and her mood was depressed.  (R. 569.)  Otherwise, Planitiff's Mental Status Exam was normal.  (*Id.*)  Dr. Fonder noted that Plaintiff said that her biggest problem at the time was feeling depressed because of her husband's affair.  (*Id.*)

On September 12, 2013, Plaintiff was seen by Nhien Nguyen, M.D., at Philhaven for a medication check.  (R. 561-64.)  Dr. Nguyen reported that Plaintiff was tearful, had normal speech, her mood was depressed and anxious, her thought content logical, she was oriented times three, her recent and remote memories were not impaired, her attention and concentration were sufficient, her language and fund of knowledge were age appropriate, her judgment was intact, and her insight was normal.  (R. 562.)  There was no change in diagnosis, and Dr. Nguyen noted that Plaintiff's condition was worsening.  (R. 562-63.)

At her October 7, 2013, medication check, Dr. Nguyen noted

18

that Plaintiff's depression was better but not great and her OCD
was worsening.  (R. 556.)  He reported that Plaintiff's behavior
was normal but a little hyper, she was talking fast, her mood and
affect were anxious, her thought content was logical, she was
oriented times three, her recent and remote memories were not
impaired, her attention and concentration were sufficient, her
judgment was intact, and her insight was normal.  (R. 557.)  Dr.
Nguyen also noted that Plaintiff could not afford the gas to attend
individual therapy.  (R. 558.)

A January 30, 2014, Outpatient Discharge Note, listed October
7, 2013, as Plaintiff's final visit.  (R. 542.)  Dr. Nguyen listed
her diagnoses as Bipolar Disorder, OCD by history, nicotine
dependence, and polysubstance dependence by history.  (*Id.*)
Plaintiff's GAF at admission was 37 and it was unknown at
discharge.  (*Id.*)  Her condition at discharge was also unknown.
(*Id.*)

A treatment note from T.W. Ponessa & Associates Counseling
Services dated December 18, 2014, indicates that Plaintiff's
diagnoses were PTSD, Mood Disorder NOS, and Polysubstance
Dependence.  (R. 677.)  She was assessed a GAF of 50.  (*Id.*)
Plaintiff reported a history of mental health problems and
irritability, difficulty sleeping, problems with appetite, problems
with memory and concentration, and hypervigilence.  (*Id.*)  Weekly
outpatient counseling and psychiatric services were recommended.

19

(*Id.*)

Lebanon pain management observations regarding Plaintiff's mental status were routinely normal as were evaluations by other providers.  (*See*, *e.g.*, R. 604, 606, 609, 634, 669.)

**2.   Opinion Evidence**

*a.   James Nolan, Ph.D.*

On March 4, 2013, James J. Nolan, Ph.D., completed a Clinical Psychological Disability Evaluation.  (R. 361.)  Dr. Nolan notes that the evaluation draws from Plaintiff's presentation and a Philhaven psychiatric team evaluation report dated February 23, 2011.  (*Id.*)  In the History of Illness portion of the evaluation, he notes that Plaintiff reported a history of mental health treatment including past psychiatric hospitalizations and childhood problems.  (*Id.*)  She said she had been admitted to Philhaven in 2011 but could not remember why.  (*Id.*)  She also reported that her principal employment had been as a waitress and her longest job was for a year at Ruby Tuesday.  (*Id.*)  Plaintiff said she left this job because her husband was having an affair with the manager, and she left her last job in May 2012 because she was mistreated by her employer.  (R. 361-62.)  Dr. Nolan described Plaintiff's mental status as follows:

> The claimant is alert, properly
> oriented, and amiable.  She is spontaneous
> with sustained eye contact.  Her thinking is
> lucid and organized.  She expresses herself
> clearly.  She is objective in judging her
> past irrational actions.  She describes her

mood as "calm," yet her emotional display is
labile.  She is teary eyed through much of
the interview, but there are instances when
she smiles broadly.  She denied having
auditory hallucinations, but she is sometimes
frightened at night by glimps [sic] of
"something scary" outside her house.  She has
no thought racing, and her cognitive flow
appears normal.  She reports becoming upset
by intrusive disturbing suspicions that her
husband is deceiving her.  She does not have
bad dreams. [] No phobias are revealed, and
she is not suicidal.  Though no fixed
delusions are detected, she can be
irrationally suspicious, especially when it
comes to her husband.  She demonstrates
abstract reasoning ability and is quick in
performing simple mental calculations. Her
intelligence is estimated to be in the high-
average range.  Her remote memory is intact.
In contrast, her recall of recent experiences
is unreliable.  She can repeat 5 digits
forward and backwards.  Her impulse control
is suspect. Her social judgment is skewed by
irrational distrust and impulsivity.  She
reasons that her emotional problems could be
genetic in origin.  She projects sincerity
and presents as a credible source of
information.

(R. 362.)  Dr. Nolan diagnosed Bipolar Disorder and Personality

Disorder NOS (with Borderline, Obsessive-Compulsive, and Paranoid

Features).  (*Id.*)  He determined that Plaintiff's prognosis was

fair with treatment that includes both pharmacotherapy and

individual therapy.  (*Id.*)  Dr. Nolan commented that Plaintiff's

erratic moods and maladaptive personality
traits significantly impair her ability to
sustain a responsible pattern of behavior.
She can assume an outgoing and charming
manner that attracts social interaction, but
her interests in others is ephemeral and she
pulls away from making friends.  She has had
several waitressing jobs, none lasting more

21

> than a year.  Certainly her knee problems
> have reduced her tolerance for the physical
> demands of waitressing.  Her
> hypersensitivity, perceptions of
> mistreatment, and unfounded suspicions
> related to the actions of supervisors and
> coworkers have, however, been the principal
> reasons for her unsatisfactory workplace
> adjustments.

(R. 362-63.)

Dr. Nolan completed a form in which he indicated the following limitations related to Plaintiff's ability to understand, remember, and carry out instructions: slight difficulty in understanding short, simple instructions; moderate difficulty in carrying out short, simple instructions; moderate difficulty understanding and remembering detailed instructions; marked difficulty carrying out detailed instructions; and moderate difficulty making judgments on simple work-related decisions.  (R. 364.)  In answer to the question of what medical/clinical findings supported these assessments, Dr. Nolan noted that Plaintiff was extremely forgetful and she must use a timer at home to remind her when to do things. (*Id.*)  Regarding Plaintiff's ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting, Dr. Nolan indicated the following: marked difficulty in interacting appropriately with the public and coworkers; extreme difficulty interacting appropriately with supervisors; extreme difficulty responding to changes in a routine work setting; and no difficulty responding appropriately to work pressures in a usual work setting.

(*Id.*)  In answer to the question of what medical/clinical findings supported these assessments, Dr. Nolan noted that Plaintiff said she was "terrible with authority."  (*Id.*)  He added that she was "inclined to feel persecuted by supervisors.  In contrast, she judges herself to be 'excellent under pressure.'  Has been chronically unstable in the jobs she has had."  (*Id.*)

b.  *Elizabeth Hoffman, Ph.D.*

On March 12, 2013, Elizabeth Hoffman, Ph.D., assessed Plaintiff's mental residual functional capacity on behalf of the state agency.  (R. 78-82.)  She opined that Plaintiff had no understanding and memory limitations and some limitations regarding sustained concentration and persistence: she is moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, and her ability to work in coordination with or proximity to others without being distracted by them.  (R. 78-79.)  Dr. Hoffman also found that Plaintiff had social action limitations: she was moderately limited in her ability to interact appropriately with the general public, her ability to accept instructions and respond appropriately to criticism from supervisors, and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 79.)  Finally, Dr. Hoffman opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting.  (R. 80.)  In

her "Additional Explanation," Dr. Hoffman explained that she found that Dr. Nolan's March 4, 2013, evaluation was not consistent with other evidence and appeared to overstate Plaintiff's limitations in the areas of concentration, persistence or pace, social functioning, and adaptation.  (*Id.*)

## 3.    **Hearing Testimony**

Plaintiff testified at her December 23, 2014, ALJ hearing that her most significant physical problems were her right knee and lower back.  (R. 51.)  She had just gone to T.W. Ponessa a week before the hearing and stated that she was scheduled to start therapy on January 5, 2015, which would include psychiatry and group therapy.  (*Id.*)  The ALJ asked Plaintiff if his record regarding household chores that she was able to dust, vacuum, do windows, grocery shop, and pay bills was correct.  (R. 55.) Plaintiff responded that he was correct to an extent but that her abilities changed significantly as of August 2014 because she was having more problems with her back.  (*Id.*)  She said that she could only wash two or three dishes at a time, could not stand at the stove and could no longer cook a meal or do laundry.  (R. 56.)

Plaintiff stated "when I'm taking my medicine I feel good," clarifying that she was referring to her mental health medicine. (R. 59.)  She testified that she had more mood swings in the preceding few months than she had before and she had equal highs and lows.  (R. 59-60.)  Plaintiff testified that she stopped going

24

to Philhaven because, when she was feeling better, she did not want to go to a psychiatrist and counselors. (R. 60-61.)

The VE testified that a hypothetical individual who was able to perform light work but needed to alternate between sitting and standing at will, could only occasionally crouch, kneel, climb ramps and stairs, could not climb ladders, ropes or scaffolds, could stoop and balance frequently, was limited to jobs that could be learned within one month that consisted of repetitive short-cycle tasks, only occasional decision making, no jobs that require precise limits, tolerances or standards directing, controlling, planning activities of others, or influencing people's opinions, attitudes, or judgments, and was limited to occasional interaction with supervisors, coworkers and others could perform jobs that exist in the national economy. (R. 65-66.) Examples provided were the jobs of small products assembler, electrical accessories assembler, and conveyer line bakery worker. (R. 66-67.)

## 4. __ALJ Decision__

By decision of January 8, 2015, ALJ Zanotto determined that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date of June 1, 2012, through the date of the decision. (R. 21.) She made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since November 6, 2012, the application date (20 CFR 416.971 et seq.).

25

2.    The claimant has the following severe
      impairments: Osteoarthritis of the
      Knees, Right Lower Extremity Complex
      Regional Pain Syndrome, Bipolar
      Disorder, and Personality Disorder (20
      CFR 416.920(c)).

3.    The claimant does not have an impairment
      or combination of impairments that meets
      or medically equals the severity of one
      of the listed impairments in 20 CFR Part
      404, Subpart P, Appendix 1 (20 CFR
      416.920(d), 416.925 and 416.926).

4.    After careful consideration of the
      entire record, the undersigned finds
      that the claimant has the residual
      functional capacity to perform light
      work as defined in 20 CFR 416.967(b).
      The claimant requires the ability to
      alternate sitting and standing at will.
      The claimant is able to crouch, kneel,
      and climb stairs and ramps occasionally.
      The claimant is unable to crawl or climb
      ladders, ropes, or scaffolds. The
      claimant is able to stoop and balance
      frequently.  The claimant is able to
      perform work that may be learned in one
      month involving repetitive, short-cycle
      tasks and only occasional decision-
      making.  The claimant is able to perform
      work that does not require precise
      limits, tolerances, or standards with no
      directing, controlling, or planning the
      activities of others.  The claimant is
      able to perform work that does not
      involve influencing people's opinions,
      attitudes, or judgments.  The claimant
      is able to perform work involving
      occasional interaction with supervisors,
      co-workers, and the public.

5.    The claimant has no past relevant work
      (20 CFR 416.965).

6.    The claimant was born on July 22, 1984
      and was 28 years old, which is defined
      as a younger individual age 18-49, on

the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 6, 2012, the date the application was filed (20 CFR 416.920(g)).

(R. 13-21.)

ALJ Zanotto supported her assessment that the intensity, persistence and limiting effects of Plaintiff's symptoms were not entirely credible with a thorough review of evidence of record. (R. 16-20.)  The ALJ explained the reasons she gave significant weight Dr. Hoffman's opinion and limited weight to Dr. Nolan's opinion.  (R. 18-19.)  She specifically cited treatment notes which she found to undermine Plaintiff's allegations regarding her physical limitations and limitations due to mental health symptoms. (R. 19-20.)  ALJ Zanotto also noted that Plaintiff's allegations are inconsistent with her own reported activities of daily living. (R. 20.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 20-21.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must
not only state the evidence considered which supports the result
but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong
reason, an explanation from the ALJ of the reason why probative
evidence has been rejected is required so that a reviewing court
can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement
that the ALJ discuss in its opinion every tidbit of evidence
included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004).  "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
.  the *Cotter* doctrine is not implicated."  *Hernandez v.
Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir.
2004) (not precedential).

    A reviewing court may not set aside the Commissioner's final
decision if it is supported by substantial evidence, even if the
court would have reached different factual conclusions.  *Hartranft*,
181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . .").  "However,

even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These

proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff alleges the following: 1) the ALJ erred as a matter of law in failing to provide any legitimate reasons for rejecting the opinion of a consulting psychologist, Dr. Nolan; 2) substantial evidence does not support the ALJ's RFC assessment; 3) substantial evidence does not support the ALJ's credibility evaluation.  (Doc. 12 at 1-2.)  Because Plaintiff's credibility is an issue pertinent to the weight attributed to Dr. Nolan's opinion, we will first address Plaintiff's assertion that substantial evidence does not support the ALJ's credibility evaluation.

33

1. **Credibility Evaluation**

Plaintiff claims the ALJ's credibility evaluation is not supported by substantial evidence because, contrary to the ALJ's reasoning, Plaintiff's treatment notes support the severity of her mental health symptoms and resultant limitations, her daily activities are not inconsistent with her assertion that she cannot perform sustained work activities eight hours a day, five days a week, her medication non-compliance should not be used to undermine her credibility, and the ALJ did not do a legally correct pain analysis.  (Doc. 12 at 24-28.)  I conclude this claimed error is not cause for remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence."  *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

An ALJ is not required to specifically mention relevant Social Security Rulings.  *See Holiday*, 76 F. App'x at 482.  It is enough

34

that his analysis by and large comports with relevant provisions. *Id.*

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which

35

results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. *Id.* In so doing, the medical evidence of record is considered along with the claimant's statements. *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Plaintiff first posits that Plaintiff's treatment notes support the severity of her mental health symptoms and resultant limitations. (Doc. 12 at 24.) While some treatment notes may support Plaintiff's position, this is not the pertinent inquiry regarding whether the ALJ's determination is based on substantial evidence. Plaintiff's cited evidence (Doc. 12 at 24-26) certainly supports a conclusion that Plaintiff has severe mental health impairments, and the ALJ made such a finding (R. 13). However, the

36

cited evidence does not necessarily go to the credibility of Plaintiff's assertions regarding the limiting effects of her mental health symptoms.  ALJ Zanotto cited specific reasons why she concluded Plaintiff was not entirely credible about mental health related limitations: evidence that she demonstrated abstract reasoning ability, she was quick in performing simple mental calculations, she presented in March 2013 with intact remote memory, her inconsistent treatment compliance, her September 2013 presentation with normal speech, normal memory, normal attention and concentration, appropriate language, appropriate fund of knowledge, and intact judgment and insight, and her cocaine use of record and use of her mother's Percocet.  (R. 20.)  Given the deference due an ALJ's credibility findings, we conclude the evidence cited is relevant and ample to the degree that a reasonable mind would accept it as adequate to support the ALJ's credibility conclusion.  *See Richardson*, 402 U.S. at 401.

Regarding activities of daily living, I concur with Plaintiff that her ability to engage in the activities listed by the ALJ do not demonstrate that she could perform a full-time position.  (Doc. 12 at 27.)  Importantly, this is not the conclusion reached by the ALJ.  Rather, *as one component of her credibility finding*, ALJ Zanotto merely concluded that the claimed limiting effects of Plaintiff's impairments were not consistent with her ability to care for herself and her children, her ability to use public

transportation, cook, grocery shop, and perform household chores. (R. 20.)

Plaintiff also asserts that her medication non-compliance should not be used to discredit her because it can be attributed to her lack of insight, a common problem in people suffering severe psychiatric impairments.  (Doc. 12 at 27.)  This assertion does not support Plaintiff's claimed error.

First, at this stage of the five-step inquiry, Plaintiff has the burden of establishing that her medication non-compliance should is attributable to her condition.  Her one sentence conclusory averment that her non-compliance is due to her lack of insight, without citation, does not satisfy this burden.

Further, the ALJ's consideration of Plaintiff's noncompliance as a factor in her credibility determination is supported by caselaw and the record.  Reference to a claimant's noncompliance with treatment or medication may be used as a factor in analyzing credibility--"an ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reasons."[2]  *Vega v. Commissioner of Social Security*, 358 F. App'x 372, 375 (3d Cir. 2009) (not precedential) (citing SSR 96-

---

[2] The Third Circuit Court of Appeals explained in *Vega* that "a denial of benefits for failure to follow a prescribed treatment plan may only be issued after the ALJ finds a disabling impairment that precludes engaging in any substantial activity, SSR 82-59." 358 F. App'x at 375.  The ALJ in *Vega* did not make such a finding nor did ALJ Zanotto.

7p).  Here the question is whether Plaintiff's claimed lack of
insight provided "good reasons" for her noncompliance.  As noted
above, Plaintiff provides no support for her assertion and it is
her burden to do so.  Moreover, a review of the record shows that
"lack of insight" was not found to be a consistent problem.  For
example, Dr. Lorenzo regularly found Plaintiff's insight to be
normal. (*See*, *e.g.*, R. 634.)  Dr. Zimmerman found Plaintiff's
insight to be fair.  (R. 577.)  Dr. Fonder found Plaintiff's
insight to be normal.  (R. 569.)  Dr. Nguyen found Plaintiff's
insight to be normal.  (R. 562.)

Plaintiff also contends that ALJ Zanotto's credibility finding
is flawed because she did not do a legally correct pain analysis.
(Doc. 12 at 27.)  Although Plaintiff alleges that the ALJ failed to
consider precipitating and aggravating factors (Doc. 12 at 28), the
ALJ explained the relevant two-step process and reviewed numerous
examinations which supported Plaintiff's allegations of pain (R.
15-19).  Importantly, ALJ Zanotto specifically cited records which
she found undermined Plaintiff's allegations regarding the limiting
effects of her physical impairments which are the sources of her
pain.  (R. 19-20.)  The ALJ was under no obligation to address the
specific limitations about which Plaintiff testified and to which
she cites in that "[t]here is no requirement that the ALJ discuss .
. . every tidbit of evidence included in the record," *Hur*, 94 F.
App'x at 133.  Overall, the analysis provided by the ALJ satisfies

39

relevant provisions and cannot be deemed error.

## 2.   Dr. Nolan's Opinion

Plaintiff asserts the ALJ erred because she provided no reason for rejecting Dr. Nolan's opinion.  (Doc. 12 at 16.)  I disagree.

First, ALJ Zanotto did not reject Dr. Nolan's opinion.  (R. 19.)  Rather, she gave it limited weight for specific reasons. (*Id.*)  The ALJ states that it is given limited weight because it is based on Plaintiff's "overall less than credible subjective complaints and is inconsistent with his own objective findings, including the claimant's normal cognitive abilities, and intact remote memory with a normal digit span result."  (*Id.*)

I have found no error in the ALJ's credibility determination, thus this basis for affording limited weight to Dr. Nolan's opinion is valid.  Similarly, the inconsistency cited by the ALJ between Dr. Nolan's objective findings and conclusions regarding Plaintiff's limitations is supported by a review of his report. Dr. Nolan's mental status examination paints a picture of greater abilities than those found in his check-the-box report.  Along with finding problem areas such as irrational, intrusive and disturbing suspicions "when it comes to her husband," unreliable recall of recent experiences, suspect impulse control, and social judgment skewed by irrational distrust and impulsivity, Dr. Nolan also found the following: Plaintiff was alert, properly oriented, and amiable; she was spontaneous with sustained eye contact; her thinking was

lucid and organized; she expressed herself clearly; she was objective in judging her past irrational actions; she denied having auditory hallucinations, she has no thought racing; her cognitive flow appeared normal; she did not report bad dreams; she did not reveal any phobias; she had no fixed delusions; she demonstrated abstract reasoning ability and was quick in performing simple mental calculations; her intelligence was estimated to be in the high-average range; and her remote memory was intact.  (R. 362.) All of these positive findings indicate the ALJ did not err in finding inconsistency in Dr. Nolan's report.[3]  Therefore, Plaintiff's claimed error is not cause for remand.

## 3.   **RFC Assessment**

With this claimed error, Plaintiff primarily takes issue with the fact that the ALJ found Plaintiff capable of light exertional work which entails "'a good deal of walking or standing'" and the ALJ found that Plaintiff has the restriction that she requires the ability to alternate sitting and standing at will. (Doc. 12 at 21-22 (quoting SSR 83-10).)  I conclude this claimed error is not cause for remand.

Plaintiff quotes the ALJ as saying that Plaintiff "'has the residual functional capacity to perform the full range of light

---

[3]  Although Plaintiff left her job at Ruby Tuesday's because her husband had an affair with her supervisor, negatives specifically associated with Plaintiff's husband would not ordinarily be work-related issues.

41

work as defined in 20 CFR 416.967(b).'" (Doc. 12 at 21 (quoting R. 15).)  This quote is not accurate--the ALJ stated that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)," and she immediately adds the limitations on Plaintiff's ability to perform light work, including the need for Plaintiff to be able to alternate between sitting and standing at will.  (R. 15.)

A review of the hypothetical provided to the VE shows that Plaintiff's further assertion that the VE was given inadequate information is without merit.  Plaintiff maintains that SSR 96-6p requires specificity as to the frequency and duration of the individual's sit/stand option so the VE can properly assess the restriction's erosion on the occupational base.  (Doc. 12 at 22.) The ALJ instructed the VE to consider an individual who "needed to be able to alternate between sitting and standing *at will*."  (R. 65 (emphasis added).)  The need to be able to alternate positions "at will" means the individual decides the frequency and duration of sitting and standing positions.  Thus, the restriction as stated provided sufficient information for the VE to consider the erosion of the occupational base.

Plaintiff's final contention that the ALJ should have sought specific testimony on the issue of the typical structure of unskilled jobs is also without merit.  (Doc. 12 at 23.)  While it may be true that "unskilled jobs are typically structured so that a

claimant cannot sit and stand at will" (Doc. 12 at 23 (citing SSR 83-12)), the ALJ inquired about a hypothetical claimant's ability to perform jobs with identified restrictions.  (R. 65-67.)  The VE acknowledged the restrictions and responded as to the hypothetical claimant's ability to perform specific jobs. (R. 65-67.)  Thus, Plaintiff's claimed error is without merit.

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this action.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: November 17, 2015